IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TECHNICAL SECURITY INTEGRATION,
INC., a Washington corporation,

               Plaintiff,

      v.

PHILADELPHIA INDEMNITY INSURANCE
COMPANY, a Pennsylvania corporation,

               Defendant.

Case No. 3:14-cv-01895-SB

**FINDINGS AND
RECOMMENDATION**

BECKERMAN, Magistrate Judge.

      This insurance coverage case arises from a defamation countersuit brought by a former

employee against Plaintiff Technical Security Integration, Inc. ("Plaintiff"), based on comments

made by its president and co-owner, Craig Swankosky. Defendant Philadelphia Indemnity Insurance

Company ("Defendant"), Plaintiff's liability insurance provider, refused to defend or indemnify

Plaintiff in connection with the defamation claims. Plaintiff then brought this suit against Defendant

on November 25, 2014, alleging a breach of contract claim stemming from Defendant's refusal to

Page 1 - FINDINGS AND RECOMMENDATION

defend and indemnify. Defendant now moves to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and asks the Court to stay proceedings pending completion of arbitration. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). For the reasons explained below, Defendant's motion to compel arbitration and to stay proceedings (ECF No. 9) should be denied.

## I. FACTS AND PROCEDURAL HISTORY

The following facts are drawn from the allegations in Plaintiff's complaint, the parties' papers, declarations, and associated exhibits, *see generally Xinhua Holdings Ltd. v. Elec. Recyclers Int'l, Inc.*, No. 1:13–CV–1409 AWI SKO, 2013 WL 6844270, at *5 (E.D. Cal. Dec. 26, 2013) (stating that, for purposes of deciding a motion to compel arbitration under the FAA, a district court may consider documents outside the pleadings), and matters of which the Court may take judicial notice.[1]

Plaintiff is a Washington corporation that designs and installs commercial surveillance, security, and safety systems for private and public sector clients throughout the country. (Def.'s Req. Judicial Notice Ex. B, at 2; Compl. ¶ 1.) Plaintiff's clients include several Indian gaming casinos located in Oregon, such as Spirit Mountain Casino and Three Rivers Casino and Hotel. (Def.'s Req. Judicial Notice Ex. B, at 2; Meltvedt-Brown Decl. Ex. 3, at 2.) Corey Tharp ("Tharp"), an Oregon resident with ties to the Indian gaming industry, was employed by Plaintiff as a branch manager from 2007 until he was terminated on December 31, 2012. (Def.'s Req. Judicial Notice Ex. B, at 2; *id.* Ex. D, at 1; Sugawa-Fujinaga Decl. Ex. 3, at 1; Pl.'s Resp. at 6.)

---

[1] As part of its motion to compel arbitration, Defendant also filed a request for judicial notice, which Plaintiff did not oppose. The Court granted Defendant's request for judicial notice (ECF No. 16), during the oral argument held on March 31, 2015.

In January 2013, Tharp began working in a similar capacity for an Oregon-based company, S&S Electrical Contracting, LLC ("S&S"). Shortly thereafter, Plaintiff learned that Spirit Mountain Casino and Three Rivers Casino and Hotel would not renew their service contracts. (Def.'s Req. Judicial Notice Ex. B, at 5; Pl.'s Resp. at 6.) About three months later, on April 12, 2013, Plaintiff filed a diversity action against Tharp and S&S (collectively, "the Underlying Defendants"), in the United States District Court for the District of Oregon. (Compl. ¶ 5.) Plaintiff sought to enforce Tharp's employment and severance agreements, and asserted claims against the Underlying Defendants for breach of contract and intentional interference with contractual advantage. (Compl ¶ 5; Pl.'s Resp. at 6; Meltvedt-Brown Decl. Ex. 3, at 2; Def.'s Req. Judicial Notice Ex. B, at 2, 4.)

On June 5, 2013, the Underlying Defendants filed an answer and affirmative defenses to Plaintiff's complaint, and Tharp also asserted counterclaims against Plaintiff for defamation (three counts) and breach of contract (two counts). Defs.' Answer, Affirmative Defenses & Countercls. at 4-8, *Technical Sec. Integration, Inc. v. S&S Elec. Contractors, LLC*, No. 3:13-cv-00636-MO (D. Or. June 5, 2013), ECF No. 12. Approximately one month later, Plaintiff tendered a claim for defense of Tharp's counterclaims to Defendant, a Pennsylvania-based liability insurance provider, under a commercial general liability policy ("the CGL Policy") and an umbrella excess liability policy that Defendant had issued to Plaintiff on September 20, 2012.[2] (Compl. ¶¶ 2-3, 8; Meltvedt-Brown Decl. Ex. 3, at 1.)

The CGL Policy provides coverage for "bodily injury and property damage liability" in Coverage A, and "personal and advertising liability" in Coverage B. (Meltvedt-Brown Decl. Ex. 4,

---

[2] As the parties do throughout their briefing, the Court will refer herein only to the terms of the CGL Policy.

Page 3 - FINDINGS AND RECOMMENDATION

at 7, 12.) The CGL Policy defines "personal and advertising injury" as any consequential "bodily injury" that arises out of a number of specified offenses, including any oral or written publication of material that slanders or libels a person. (Meltvedt-Brown Decl. Ex. 4, at 20.) "Bodily injury" is defined under the CGL Policy as: "a. . . . [B]odily injury, sickness or disease sustained by a person, and includes mental anguish resulting from any of these; and b. Except for mental anguish, includes death resulting from the foregoing (Item a. above) at any time." (Sugawa-Fujinaga Decl. Ex. 3, at 5.)

Relevant to the instant motion are the CGL Policy's employment-related practices exclusion and arbitration endorsement. Both Coverage A and Coverage B are limited by the employment-related practices exclusion, which excludes from coverage any "bodily injury" or "personal and advertising injury" that arises out of "[e]mployment-related practices, policies, acts or omissions, such as . . . defamation," regardless of "[w]hether the injury-causing event . . . occurs before employment, during employment or after employment of that person[.]" (Meltvedt-Brown Decl. Ex. 4, at 24.) The CGL Policy's arbitration endorsement, found under the bold, all-caps title "Binding Arbitration," provides:

> If we and the insured do not agree whether coverage is provided under this [CGL Policy] for a claim made against the insured, then either party may make a written demand for arbitration.
>
> When this demand is made, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within [thirty] days, either may request that selection be made by a judge of a court having jurisdiction. Each party will:
>
> > 1. Pay the expenses it incurs; and
> >
> > 2. Bear the expenses of the third arbitrator equally.

> Unless both parties agree otherwise, arbitration will take place in the county or parish
> in which the address shown in the Declarations is located [i.e., Snohomish County,
> Washington]. Local rules of law as to procedure and evidence will apply. A decision
> agreed to by two of the arbitrators will be binding.

(Meltvedt-Brown Decl. Ex. 4, at 26; *id.* Ex. 4, at 1; Def.'s Mem. Supp. at 7.)

In a letter dated July 24, 2013, Defendant rejected the tender and denied its duty to defend

Plaintiff in the underlying proceeding, citing the CGL Policy's employment-related practices

exclusion. (Sugawa-Fujinaga Decl. Ex. 3, at 1, 3-6.) In May of the following year, a jury awarded

Tharp $50,000 after a trial on, *inter alia*, his two remaining defamation counterclaims. (Pl.'s Resp.

at 3; Compl. ¶ 9; Meltvedt-Brown Decl. Ex. 3, at 3.)

Roughly five months later, on September 23, 2014, Plaintiff tendered a "demand for payment

of the judgment . . . and its resulting attorney fees and costs in the [u]nderlying [a]ction to

[Defendant] for indemnification." (Meltvedt-Brown Decl. Ex. 2, at 1.) Plaintiff then filed the present

action against Defendant in federal district court on November 25, 2014. One day later, Defendant

issued a second letter declaring that it had no obligation to defend or indemnify Plaintiff, and that

any further dispute would be subject to binding arbitration. (Compl. at 3; Meltvedt-Brown Decl. Ex.

3, at 13.)

On January 16, 2015, after the Court granted a motion for extension of time to file an answer,

Defendant filed its motion to compel arbitration and stay the proceedings pursuant to the FAA. The

Court heard argument on March 31, 2015.

## II. LEGAL STANDARDS

"The FAA provides that any arbitration agreement within its scope 'shall be valid,

irrevocable, and enforceable,' and permits a party 'aggrieved by the alleged refusal of another to

Page 5 - FINDINGS AND RECOMMENDATION

arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation and ellipses omitted). "The FAA requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal citation omitted); *Chiron*, 207 F.3d at 1130 ("[T]he Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'") (citation omitted).

"The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen*, 763 F.3d at 1175 (citing *Chiron*, 207 F.3d at 1130). To determine "whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013) (citing *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011)).

In determining whether an arbitration agreement encompasses the dispute at issue, district courts must be mindful that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Any doubts as to the scope of an arbitration

agreement should be resolved in favor of arbitrability. *Simula v. Autoliv*, 175 F.3d 716, 721 (9th Cir. 1999).

### III. DISCUSSION

Defendant moves to compel binding arbitration and to stay this case pending completion of arbitration. As discussed, in deciding a motion to compel arbitration under the FAA, the role of the district court "is to determine (1) whether a valid agreement to arbitrate exists and, *if it does*, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (emphasis added) (quoting *Chiron*, 207 F.3d at 1130). Because, as explained below, the Court concludes that the CGL Policy's arbitration clause is invalid, the Court need not address whether Plaintiff's breach of contract claim falls within the scope of the arbitration clause.

Before assessing the validity of the CGL Policy's arbitration clause, the Court must first resolve whether such a determination is governed by the law of Oregon or Washington. It is well established that federal courts sitting in diversity look to the law of the forum state when making choice of law determinations. *Nguyen*, 763 F.3d at 1175 (citing *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam)); *Coneff v. AT & T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012) ("When sitting in diversity, we apply the choice-of-law rules of the forum state."). Because this Court is located in Oregon, it applies Oregon's choice-of-law rules to the current dispute.

Former Oregon Revised Statutes ("ORS") §§ 81.100 to 81.135 (2009), renumbered as ORS §§ 15.300 to 15.380 (2011), "provide[] the framework to be used by an Oregon court in determining what state's law applies when the court enforces a contract." *CACV of Colo., LLC v. Stevens*, 248

Page 7 - FINDINGS AND RECOMMENDATION

Or. App. 624, 629 n.6 (2012). Indeed, as was explained in *Herron v. Wells Fargo Fin., Inc.*, No. 05-CV-659-ST, 2006 WL 2422831 (D. Or. May 22, 2006): "In cases where material differences exist, Oregon's [common law] conflict-of-laws jurisprudence determines which state's laws should apply. This approach applies to all claims except contract claims, [which are governed by former ORS §§ 81.100 to 81.135]." *Id.* at *9. The same is true when there are no material differences between the laws of the interested states: "Upon examining the language of the statutes, their exceptions and its goals, this court concludes that they were intended to replace the common law practice of applying Oregon law [by default] when there are no material differences between the [laws of the] interested states." *Id.* at *10; *see also Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475 (2001) ("We previously have explained that if there is no material difference—*i.e.*, if there is a 'false conflict' instead of an 'actual conflict'—Oregon law applies.") (citation omitted).

Two statutes are relevant to this proceeding: (1) ORS § 15.350, which governs scenarios where the underlying contract includes a choice-of-law clause; and (2) ORS § 15.360, which sets forth a multi-factor test for determining "the most appropriate law" to be applied when the contracting parties have not selected a choice of law, or, alternatively, if their choice of law is not "effective." The Court will address these statutes in turn.

ORS § 15.350 provides that "the contractual rights and duties of the parties are governed by the law or laws that the parties have chosen." OR. REV. STAT. § 15.350(1). The statute, however, requires that: "The choice of law must be express or clearly demonstrated from the terms of the contract. In a standard-form contract drafted primarily by only one of the parties, any choice of law must be express and conspicuous." OR. REV. STAT. § 15.350(2). Thus, to satisfy ORS § 15.350, "a contractual choice-of-law provision [must] be express and clear, and it [must satisfy] the additional

Page 8 - FINDINGS AND RECOMMENDATION

requirement that it be conspicuous when part of a standard form contract drafted primarily by one of the parties, here, [Defendant]." *Powell v. Sys. Transp., Inc.*, Case No. 3:13–CV–1216–AC, --- F. Supp. 3d --- , 2015 WL 364338, at *6 (D. Or. Jan. 26, 2015).

The CGL Policy does not satisfy the requirements of ORS § 15.350. The CGL Policy's arbitration clause provides that, "[u]nless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located [i.e., Snohomish County, Washington]. Local rules of law as to procedure and evidence will apply." (Meltvedt-Brown Decl. Ex. 4, at 26; *id*. Ex. 4, at 1; Def.'s Mem. Supp. at 7.) The clause refers to the procedural and evidentiary rules to be applied in the arbitration proceeding, and is not a traditional choice-of-law clause. *See, e.g., Johnston Cnty. v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 92 (1992) (explaining that a "choice of law provision names a particular state and provides that the substantive laws of that jurisdiction will be used . . . , regardless of any conflicts between the laws of the named state and the state in which the case is litigated."). The absence of a choice-of-law clause in the CGL Policy removes this case from the purview of ORS § 15.350, as the parties acknowledged during oral argument.[3] (*See* Mot. Compel Hr'g Tr. 4, 23, Mar. 31, 2015.)

Given the absence of a choice-of-law clause in the CGL Policy, the Court must turn to ORS § 15.360 in order to determine the appropriate state law to apply. *See Herron*, 2006 WL 2422831, at *11 (making an analogous transition under the prior versions of the statutes at issue); *Peace River Seed Co-Op., Ltd. v. Proseeds Mktg., Inc.*, 253 Or. App. 704, 721 (2012) ("In the absence of an effective choice of law between the parties, the court considers which forum has the most significant

---

[3] Even if the parties had not so acknowledged, however, the Court would still conclude that the CGL Policy's arbitration clause fails to satisfy ORS § 15.350, because it does not include an express, clear, and conspicuous Washington choice-of-law clause.

contacts with the parties and the transaction to determine which forum's law applies." (citing, *inter*

*alia*, OR. REV. STAT. § 15.360), *rev'd in part on other grounds*, 355 Or. 44 (2014)). According to

the statute, the appropriate state law to apply is determined by:

> (1) Identifying the states that have a relevant connection with the transaction or the parties, such as the place of negotiation, making, performance or subject matter of the contract, or the domicile, habitual residence or pertinent place of business of a party;
>
> (2) Identifying the policies underlying any apparently conflicting laws of these states that are relevant to the issue; and
>
> (3) Evaluating the relative strength and pertinence of these policies in:
>
> > (a) Meeting the needs and giving effect to the policies of the interstate and international systems; and
> >
> > (b) Facilitating the planning of transactions, protecting a party from undue imposition by another party, giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states.

OR. REV. STAT. § 15.360.

The ORS § 15.360 factors weigh in favor of applying Washington state law here. On the one

hand, Oregon has relevant connections with the parties to this case. This coverage dispute stems

from counterclaims against Plaintiff filed by an Oregon resident in Oregon federal court. In addition,

Plaintiff elected to file this breach of contract action against Defendant, a Pennsylvania corporation,

in Oregon federal court. On the other hand, however, none of the parties that participated in the

underlying transaction (i.e., entering into the insurance contract) are residents of Oregon. *Cf. Capital*

*One Bank v. Fort*, 242 Or. App. 166, 174 n.4 (2011) (noting, in a situation where the choice-of-law

statutes did not apply, that "most importantly, Oregon is the residence of one of the parties to the

Page 10 - FINDINGS AND RECOMMENDATION

contract"). The insured (Plaintiff), is a Washington company with its principal place of business in Lake Stevens, Washington, and the parties entered into the insurance contract through a Washington broker. (Mot. Compel Hr'g Tr. 21-22; Meltvedt-Brown Decl. Ex. 4, at 1.) These latter considerations weigh heavily in favor of applying Washington law.

Also militating in favor of the application of Washington state law are these facts: (1) Plaintiff's president and co-owner resides in Washington; (2) the insurance policy calls for arbitration in Snohomish County, Washington; (3) the insurance policy provides that Snohomish County's local rules of law as to arbitration procedure and evidence will apply; (4) Defendant's counsel acknowledged during oral argument that the situs of contract negotiations, "a classical factor in terms of choice of law in a contract dispute setting," took place in Washington and California, where Plaintiff's other co-owner and vice president resides, but did not take place in Oregon; (5) Defendant delivered the certificate of insurance in Washington; and (6) Defendant never performed the contract in Oregon, as it denied its duty to defend and indemnify Plaintiff against Tharp's counterclaims (by contrast, contract performance did occur in Washington, inasmuch as insurance premiums were paid by a Washington corporation to Defendant). (Mot. Compel Hr'g Tr. 6-8, 10-11, 21-22; Meltvedt-Brown Decl. Ex. 4, at 26; *id.* Ex. 4, at 1.)

Having addressed the first factor under ORS § 15.360, the Court must next identify the policies underlying any apparently conflicting laws of Oregon and Washington that are relevant to the issue of whether arbitration agreements in insurance policies are enforceable. The Court must then consider the relative strength and pertinence of these policies based on, among other considerations, "giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states." Before

Page 11 - FINDINGS AND RECOMMENDATION

doing so, however, the Court provides a brief overview of the relevant legal authorities from each state, beginning with Oregon.

Article I, section 17, of the Oregon Constitution guarantees a jury trial "in those classes of cases in which the right [to a jury trial] was customary at the time the [Oregon] [C]onstitution was adopted or in cases of like nature." *Molodyh v. Truck Ins. Exch*, 304 Or. 290, 295 (1987). Oregon courts have nonetheless compelled arbitration pursuant to arbitration agreements in insurance contracts. For example, in *Hoeft v. Rain & Hail, LLC*, No. Civ. 01–581–AS, 2001 WL 34039497 (D. Or. Oct. 31, 2001), there was an underlying insurance coverage dispute and the insurer sought to compel arbitration pursuant to the policy and the FAA. *Id.* at *1. The plaintiffs argued that the arbitration provision violated their right to a jury trial, and therefore was unenforceable. *Id.* at *2. After detailing the Oregon Supreme Court's decision in *Molodyh*, the district court held that, "to the extent Oregon law conflicts with the Policy provisions, it is preempted by federal law." *Id.* at *3. In so holding, the district court stated:

> Plaintiffs' right to a jury trial on their claim under the Policy and the Policy's provision that all claims under the Policy be arbitrated are more than inconsistent, they are in direct conflict. The policy contained a provision which required the parties to submit their disputes to binding arbitration. Oregon's constitutional right to a jury trial is inconsistent with this arbitration provision and is preempted by application of the Supremacy Clause. Plaintiffs are bound by the arbitration clause set forth in the Policy.

*Id.* at *4; *see also Anderson v. Wash. Mut. Bank*, No. 10–6113-TC, 2010 WL 4827500, at *3-4 (D. Or. Oct. 25, 2010) (concluding that the FAA preempted a portion of Oregon's Uniform Arbitration Act, and that the one-time employee voluntarily waived her right to a jury trial when she signed a binding arbitration agreement).

In light of *Hoeft* and *Anderson*, Defendant should prevail on its motion to compel arbitration if Oregon law were to apply. If Washington law applies, however, the Washington Supreme Court's recent en banc decision in *State Dep't of Transp. v. James River Ins. Co.*, 176 Wash. 2d 390 (2013), requires a different result. In *James River*, the insurer appealed the trial court's denial of a motion to compel arbitration of an insurance coverage dispute, pursuant to the policies' arbitration clauses. *Id* at 392. The arbitration clauses in the insurance policies provided, in relevant part: "Should we and the insured disagree as to the rights and obligations owed by us under this policy, including the effect of any applicable statutes or common law upon the contractual obligations otherwise owed, either party may make a written demand that the dispute be subjected to binding arbitration." *Id.* at 393.

The Washington Supreme Court construed Revised Code of Washington ("RCW") § 48.18.200(1)(b), which prohibits insurance contracts from "depriving the courts of this state of the jurisdiction of action against the insurer," and held that it prohibits binding arbitration agreements in insurance contracts. *Id.* at 400. As a result, the *James River* court had to address whether RCW § 48.18.200(1)(b) reverse preempted the FAA, under the McCarran-Ferguson Act:

> Generally, when a state enacts a statute of general applicability prohibiting arbitration agreements, the statute may be inconsistent with the FAA, and if so, the FAA arguably preempts that state law. However, there is an exception to this general rule when the state statute was enacted 'for the purpose of regulating the business of insurance' within the meaning of the McCarran-Ferguson Act. . . . Because the FAA does not specifically relate to the business of insurance, the parties dispute only whether RCW 48.18.200(1)(b) regulates the 'business of insurance.' If it does, then the McCarran-Ferguson Act 'reverse preempts' the FAA, shielding the statute from invalidation.

*Id.* at 400-01 (internal citation omitted). After concluding that RCW § 48.18.200(1)(b) "regulates the 'business of insurance' because it is aimed at protecting the performance of an insurance contract by ensuring the right of the policyholder to bring an action in state court to enforce the contract," the

Page 13 - FINDINGS AND RECOMMENDATION

Washington Supreme Court held that the statute was "shielded from preemption by the FAA under the McCarran-Ferguson Act." *Id.* at 402. *James River* also noted that its holding was consistent with prior Washington Supreme Court precedent, "as well as the holdings of numerous courts in other jurisdictions." *Id.* & n.5 (citing, *inter alia*, *Am. Bankers Ins. Co. v. Inman*, 436 F.3d 490 (5th Cir. 2006); *Standard Sec. Life Ins. Co. v. West*, 267 F.3d 821 (8th Cir. 2001) (per curiam); *Mut. Reinsurance Bureau v. Great Plains Mut. Ins. Co.*, 969 F.2d 931 (10th Cir. 1992); *McKnight v. Chi. Title Ins. Co., Inc.*, 358 F.3d 854 (11th Cir. 2004) (per curiam)).

*James River* highlights that the Washington Legislature enacted a statute intended specifically to protect the right of policyholders to bring an original action against insurers in Washington courts. *Id.* at 402. This Court has not been directed to, nor has it identified, any legal authority indicating that the Oregon Legislature has enacted an equivalent statute to protect the policyholders in this state. That is an important distinction that favors applying Washington state law here. Indeed, applying Washington state law would give effect to the justified expectations of the contracting parties, evidenced most notably by the plain language of the arbitration clause drafted by Defendant, and the domicile of both Plaintiff and the insurance broker. For the foregoing reasons, the factors set forth in ORS § 15.360 weigh in favor of applying Washington state law to the issue of whether the arbitration endorsement is valid, instead of Oregon law.

Having determined that Washington law applies in this case, the remaining dispositive question is whether this Court is bound by the Washington Supreme Court's interpretation of Washington state law in *James River*, and conclude that the arbitration endorsement in the CGL Policy is unenforceable.

The Eleventh Circuit was confronted with a similar question in *McKnight*. In that case, the plaintiffs acquired a tract of property in Georgia and contracted with the defendant for title insurance. *McKnight*, 358 F.3d at 856. The insurance contract included an arbitration provision. *Id*. The plaintiffs filed a breach of contract action stemming from a coverage dispute several years later, and the defendant subsequently moved to compel arbitration pursuant to the terms of the insurance contract. *Id*. The district court denied the defendant-insurer's motion to compel, reasoning that the Georgia Arbitration Code's exclusion of arbitration provisions in insurance contracts made the arbitration provision unenforceable. *Id*.

On appeal, the defendant argued that the district court erred in concluding that the Georgia Arbitration Code deemed the arbitration provision unenforceable. *Id*. The Eleventh Circuit framed the appeal as presenting a single issue: whether the FAA preempted the Georgia Arbitration Code. *Id*. Resolution of that issue involved the intersection of three statutes: the FAA, the McCarran-Ferguson Act, and Georgia Code Annotated ("GCA") § 9-9-2(c)(3), a statute cited by Georgia state appellate court as grounds for refusing to enforce arbitration provisions in insurance contracts. *Id*. at 856-57. As the Eleventh Circuit explained, "[i]f the state has an anti-arbitration law enacted for the purpose of regulating the business of insurance, and if enforcing, pursuant to the [FAA], an arbitration clause would invalidate, impair, or supersede that state law, a court should refuse to enforce the arbitration clause [under the McCarran-Ferguson Act]." *Id*. at 857.

The parties in *McKnight* did not dispute whether FAA preemption would invalidate, impair, or supersede GCA § 9-9-2(c)(3), and therefore the Eleventh Circuit determined that it need only to address whether the statute was "a law enacted" by the Georgia Legislature "for the purpose of regulating the business of insurance," as that term is used in the McCarran-Ferguson Act. *Id*. at 858.

Page 15 - FINDINGS AND RECOMMENDATION

Relying on Supreme Court precedent that defined the term, the Eleventh Circuit concluded "that a provision in a state's arbitration code excepting insurance contracts is a law regulating the business of insurance." *Id.* The Eleventh Circuit noted that the Georgia statute: (1) affected the relationship between the insurer and insured; (2) affected the transferring or spreading of a policyholder's risk by introducing the possibility of jury verdicts into the process for resolving disputed claims; (3) regulated an integral part of the insurer-insured relationship by invalidating an otherwise mandatory insurance contract term that allows either party to compel arbitration of policy disputes, thereby subjecting all policy disputes to the possibility of a jury trial; and (4) was expressly limited by the Georgia Legislature to entities within the insurance industry.

*McKnight* is instructive on the issue of how much weight this Court should give to the Washington Supreme Court's opinion on these issues, as articulated in *James River*. In *McKnight*, the Eleventh Circuit noted that the Georgia Court of Appeals had addressed the same issue, and had concluded that the McCarran-Ferguson Act excepted GCA § 9-9-2(c)(3) from preemption by the FAA, and the Georgia Supreme Court gave its tacit approval by denying certiorari. *Id.* at 858-59. The Eleventh Circuit placed special emphasis on the Georgia appellate court decision, despite characterizing it as persuasive, non-binding authority:

> While the [Georgia Court of Appeal]'s characterization of § 9-9-2(c)(3) as a law enacted to regulate the business of insurance is not binding on us, it is relevant to our inquiry, because Congress, in leaving the business of insurance to the States, was legislating concerning a concept which had taken on its coloration and meaning largely from state law, from state practice, from state usage. Considering the [Georgia Court of Appeal]'s characterization, along with the other four considerations [described above], we conclude that § 9-9-2(c)(3) is a law enacted to regulate the business of insurance, within the meaning of the McCarran-Ferguson Act. Thus, [GCA] § 9-9-2(c)(3) is excepted from preemption by the [FAA].

*Id.* at 859 (internal citations and quotation marks omitted). In light of the foregoing, the Eleventh Circuit affirmed the district court's denial of the defendant-insurer's motion to compel arbitration pursuant to the FAA. *Id.*

The Ninth Circuit has also placed considerable emphasis on the views of a state's highest court in the context of the McCarran-Ferguson Act. In *Ojo v. Farmers Group, Inc.*, 600 F.3d 1201 (9th Cir. 2010) (per curiam), the plaintiff, an African-American resident of Texas, brought suit on behalf of himself and other minorities against his insurer, a Nevada corporation that maintained its headquarters in Los Angeles, California, as well as its affiliates, subsidiaries, and reinsurers. *Id.* at 1202. The plaintiff claimed that the defendants violated the federal Fair Housing Act ("FHA") by using a number of "undisclosed factors" in their credit-scoring system that disparately impacted minorities. *Id.* A three-judge panel of the Ninth Circuit initially reversed the district court's determination that the Texas Insurance Code preempted the plaintiff's FHA claim under the reverse preemption standard set forth in the McCarran-Ferguson Act. *Id.* at 1202-03.

On rehearing en banc, the Ninth Circuit noted that the plaintiff's FHA claim may in fact be "reverse-preempted" by Texas law under the McCarran-Ferguson Act. *Id.* at 1203. That would require satisfaction of three conditions: "(1) the federal law does not specifically relate to insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of federal law to the case might invalidate, impair, or supersede the state law." *Id.* (citing *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999)). Because it was undisputed that the FHA does not specifically relate to insurance and that the relevant provisions of Texas law were enacted for the purpose of insurance regulation, the "dispositive question" in *Ojo* was whether application of the FHA to the plaintiff's case "might invalidate, impair, or supersede the provisions of the Texas Insurance Code

Page 17 - FINDINGS AND RECOMMENDATION

that authorize insurance companies to use credit scoring in setting insurance rates." *Id.* at 1203-04. Rather than answer that question, the Ninth Circuit certified it to the Texas Supreme Court and agreed to abide by its decision in any subsequent opinion, noting that it was an unsettled question of law that would have pervasive implications for future claims brought against Texas insurers. *Id.* at 1204-05; *see also Ojo Farmers Group, Inc.*, 356 S.W.3d 421, 424 (Tex. 2011) ("In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law.").[4]

*McKnight* and *Ojo* demonstrate that this Court is not *bound* by the Washington Supreme Court's decision in *James River,* in determining whether the McCarran-Ferguson Act shields RCW § 48.18.200(1)(b) from preemption by the FAA. However, both decisions also confirm that the opinions of a state's highest court are to be accorded considerable weight by a federal court, under the three-prong test outlined by the Supreme Court in *Humana, supra*, 525 U.S. at 307. *See also Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1142 n.3 (9th Cir. 2003) ("The McCarran-Ferguson Act was an effort by Congress to protect states' primary regulatory role over the insurance industry.").

This Court concludes that in deference to the Washington Supreme Court's analysis in *James River*, RCW § 48.18.200(1)(b) satisfies the three requirements of the McCarran-Ferguson Act, and therefore reverse preempts the FAA.

---

[4] On June 24, 2011, about a month after the Texas Supreme Court issued its decision, the Ninth Circuit granted the parties' stipulated motion to dismiss with prejudice.

Page 18 - FINDINGS AND RECOMMENDATION

The first requirement under the McCarran-Ferguson Act is that the relevant federal law does not specifically relate to insurance. *Humana*, 525 U.S. at 307. "[T]here is no question that the FAA does not relate specifically to the business of insurance; thus, the first requirement of the McCarran-Ferguson Act is satisfied." *Inman*, 436 F.3d at 493 (internal citation and quotation marks omitted); *see also McKnight*, 358 F.3d at 857 ("The parties and we agree that the [FAA] does not itself specifically relate to the business of insurance.").

The second requirement under the McCarran-Ferguson Act is also satisfied. Three criteria are relevant to deciding whether a state law—here, RCW § 48.18.200(1)(b)'s prohibition against arbitration clauses in insurance contracts—regulates the business of insurance: "(1) whether the practice in question has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry." *Inman*, 436 F.3d at 493 (internal quotation marks omitted). These criteria are met here.

In *James River*, the Washington Supreme Court held that RCW § 48.18.200(1)(b) "demonstrates the legislature's intent to protect the right of policyholders to bring an original action against the insurer in the courts of this state," and "is properly interpreted as a prohibition on binding arbitration agreements." *James River*, 176 Wash. 2d at 399 (quotation marks omitted). It is clear that the statute, as construed by the Washington Supreme Court, has the effect of the transferring or spreading of a policyholder's risk by introducing the possibility of a jury verdict into the process for disputed claims. *See McKnight*, 358 F.3d at 858 (making an analogous observation). In addition, the statute: (1) is limited to entities within the insurance industry, *see West*, 267 F.3d at 824 (holding that the statute at issue was "limited to entities within the insurance industry because insurance is the only

industry singled out for an across-the-board invalidation of arbitration clauses"); and (2) regulates

an integral part of the insurer-insured relationship by invalidating an otherwise mandatory insurance

contract term that allows either party to compel arbitration of coverage disputes, *see McKnight*, 358

F.3d at 858-59 (making a similar observation and placing emphasis on a decision rendered by the

Georgia Court of Appeals). Thus, the second requirement under the McCarran-Ferguson Act is

satisfied.

The third and final requirement under the McCarran-Ferguson Act asks whether the

application of federal law to the case "might invalidate, impair, or supersede the state law." *Ojo*, 600

F.3d at 1203 (citing *Humana*, 525 U.S. at 307). Similar to the en banc decision in *Ojo*, this Court

resolves the question by deferring largely to the judgment of the Washington Supreme Court, which

held that RCW § 48.18.200(1)(b) is "a provision prohibiting binding arbitration agreements in

insurance contracts." *James River*, 176 Wash. 2d at 402.[5] If Washington law prohibits insurance

companies from including arbitration agreements in its insurance contracts, then allowing Defendant

to compel arbitration under the FAA would impair Washington law. *Cf. Ojo*, 600 F.3d at 1204 ("If

Texas law permits insurance companies to use credit scores even if the factors used to compute

scores may have a racially disparate impact that could violate the FHA, then allowing Ojo to sue

---

[5] It should be noted that *James River* explicitly rejected the First Circuit's seemingly contrary interpretation of Massachusetts law on whether the language "depriving the courts of jurisdiction of action" prohibits arbitration agreements in insurance contracts. *Id.* at 400 n.4 (citing *DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 79 (1st Cir. 2000)). However, the First Circuit did not have the benefit of precedent from the Massachusetts Supreme Judicial Court when it issued its decision. *DiMercurio*, 202 F.3d at 80 ("[T]he Massachusetts arbitration act apparently took arbitration agreements outside the scope of [the prior-enacted statute]'s bar on insurance policy provisions that divest courts of jurisdiction. Though we have found no precedent stating so explicitly, that conclusion is borne out by cases and commentary.").

Page 20 - FINDINGS AND RECOMMENDATION

Defendants under the FHA for this practice would impair Texas law."). Accordingly, the third requirement of the McCarran-Ferguson Act is satisfied.

RCW § 48.18.200(1)(b) satisfies the three requirements of the McCarran-Ferguson Act, and thus preempts the FAA. Accordingly, this Court concludes that the CGL Policy's arbitration endorsement is invalid under Washington law, and recommends that the district court deny Defendant's motion to compel arbitration.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to compel arbitration and to stay proceedings (ECF No. 9) should be DENIED.

## V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 27th day of May, 2015.

STACIE F. BECKERMAN
United States Magistrate Judge

Page 21 - FINDINGS AND RECOMMENDATION