**Jonathan M. Radmacher, OSB No. 924314**
E-mail: jonathanr@mcewengisvold.com
McEwen Gisvold LLP
1100 SW Sixth Avenue, Suite 1600
Portland, OR 97204
Telephone: (503) 226-7321
Facsimile: (503) 243-2687

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **TECHNICAL SECURITY INTEGRATION, INC.,** a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>**PHILADELPHIA INDEMNITY INSURANCE COMPANY,** a Pennsylvania corporation,<br><br>Defendants. | Civil No. 3:14-CV-01895-SB<br><br>**DECLARATION OF JONATHAN RADMACHER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

I, Jonathan Radmacher, declare personal knowledge of the following facts and if called to testify as a witness, would state the following:

1. I am one of the attorneys for Plaintiff, Technical Security Integration ("TSI") in the above-captioned case.

2. Attached hereto as Exhibit 101 are the first and fifth pages of Judge Mosman's written ruling in *Technical Security Integration, Inc. v. S&S Electrical Contractors, LLC, and Corey Tharp*, USDC Case No. 3:13-cv-00636-MO ("the Underlying Case").

3. Attached hereto as Exhibit 102 are the first several pages of the joint designation of deposition testimony of John Katnic, submitted as evidence at trial in the Underlying Case.

DECLARATION OF JONATHAN RADMACHER
IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
PAGE 1
CASE NO. 3:14-CV-01895-SB

McEWEN GISVOLD LLP
1100 S.W. Sixth Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 226-7321; Facsimile: (503) 243-2687
Email: jonathanr@mcewengisvold.com

4.	Attached hereto as Exhibit 103 is a copy of the Satisfaction of Judgment entered in the Underlying Case, after Plaintiff paid the $57,271.22 judgment entered against it.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR THE USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED this 25th day of June, 2018.

s/ Jonathan M. Radmacher
Jonathan M. Radmacher

**DECLARATION OF JONATHAN RADMACHER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
PAGE 2
CASE NO. 3:14-CV-01895-SB

McEWEN GISVOLD LLP
1100 S.W. Sixth Avenue, Suite 1600
Portland, Oregon 97204
Telephone: (503) 226-7321; Facsimile: (503) 243-2687
Email: jonathanr@mcewengisvold.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2018, I served the foregoing **DECLARATION OFJONATHAN RADMACHER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on the persons listed below by the methods indicated below.

| | |
|---|---|
| Guy Keating, OSB No. 074367<br>Schulte, Anderson, Downes Aronson & Bittner, PC<br>811 SW Naito Parkway, Suite 500<br>Portland, OR 97204-3379<br>Telephone: 503-223-4131<br>Facsimile: 503-223-1346<br>Email: gkeating@schulte-law.com<br><br>Of Attorneys for Defendant | __ U.S. Mail<br>__ Facsimile<br>__ Hand Delivery<br>__ E-mail<br>_X_ ECF |
| Thomas H. Nienow, Admitted *Pro Hac Vice*, CA Bar No. 136454<br>Nielsen, Haley & Abbott LLP<br>100 Smith Ranch Road, Suite 350<br>SanRafael, CA 94903<br>Telephone: 415-693-0900<br>Facsimile: 415-693-9674<br>Email: tnienow@nielsenhaley.com<br><br>Of Attorneys for Defendant | __ U.S. Mail<br>__ Facsimile<br>__ Hand Delivery<br>__ E-mail<br>_X_ ECF |

Dated: June 25, 2018

MCEWEN GISVOLD LLP

By: _s/ Jonathan M. Radmacher_
Jonathan M. Radmacher, OSB No. 924314
Of Attorneys for Plaintiff

CERTIFICATE OF SERVICE
3:14-CV-01895-SB

U:\13022\13022-003\JMR Declaration re MSJ.wpd

**McEWEN GISVOLD LLP**
**1100 S.W. Sixth Avenue, Suite 1600, Portland, Oregon 97204**
**Telephone: (503) 226-7321; Facsimile (503) 243-2687**
**Email: jonathanr@mcewengisvold.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**TECHNICAL SECURITY INTEGRATION, INC.,**

    Plaintiffs,

v.

**S & S ELECTRICAL CONTRACTORS, LLC, and COREY THARP,**

    Defendants.

No. 3:13-cv-00636-MO

OPINION AND ORDER

**MOSMAN, J.,**

    Defendants S & S Electrical Contractors, LLC ("S&S"), and Corey Tharp move [64] for summary judgment on each of the claims in Plaintiff Technical Security Integration, Inc.'s ("TSI") Amended Complaint [46], as well as on their own five counterclaims. For its part, TSI moved [69] for summary judgment on Defendants' counterclaims and on its own claim for conversion. On April 25, 2014, I heard oral argument on the parties' motions. The following brief opinion sets out my rulings.

1 – OPINION AND ORDER

Exhibit 101
Page 1 of 2

However, a reasonable jury might also conclude that Mr. Tharp suffered no actual damages, making summary judgment inappropriate. Presumed damages are available only in actions for defamation per se, not in contract actions. Finally, concerning the fifth counterclaim, a reasonable jury could conclude that Mr. Swankosky made defamatory statements to Mr. Katnic of Synectics. However, because Mr. Swankosky denies making any statements at all to Mr. Katnic, a genuine dispute of material fact exists.

## II.    Plaintiff's Motion for Partial Summary Judgment

Because Defendants' motion for summary judgment as to Plaintiff's conversion claim is granted, Plaintiff's motion for judgment in its favor is DENIED.

Plaintiff's motion is GRANTED as to Defendants' first counterclaim. Mr. Swankosky's statements to Mr. Bobb and Mr. Howerton concerning issues with Mr. Tharp's performance were made in the interest of defending TSI's decision to terminate Mr. Tharp, and therefore are privileged. Further, no reasonable jury could conclude either that these statements lacked a reasonable basis in fact or that they were more defamatory than reasonably necessary.

Plaintiff's motion is DENIED as to Defendants' remaining counterclaims. Concerning the second, a reasonable jury might find that Mr. Swankosky's statements about Mr. Tharp's possible involvement in a theft of TSI equipment cast Mr. Tharp in a more suspicious light than reasonably necessary to defend TSI's decision to terminate him. As to the third, the record also permits a reasonable inference that Mr. Swankosky should have known that Mr. Bobb or Mr. Howerton would republish Mr. Swankosky's statements to Mr. Bossley. Regarding the fourth, a reasonable jury could find that Mr. Swankosky's statements violated the nondisparagement provision of Mr. Tharp's severance agreement, entitling Mr. Tharp at least to nominal damages. (*See* Am. Compl. Ex. 2 [46-2] at 2.) Fifth and finally, Mr. Swankosky's statements to Mr.

# The Deposition Of:
## John Katnic

**Date:** November 26, 2013

Technical Security Integration, Inc. v. S&S Electrical Contractors, LLC; and Corey Tharp

Taken On Behalf Of The Defendants



# SYNERGY
## LEGAL
LITIGATION SUPPORT SERVICES

Exhibit 102
Page 1 of 7

John Katnic

1 (Pages 1 to 4)

### Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF OREGON
 3            Portland Division
 4
 5   TECHNICAL SECURITY
 6   INTEGRATION, INC., a
 7   Washington corporation,
 8        Plaintiff,
 9   vs.          No. 1303-04600
10   S&S ELECTRICAL CONTRACTORS,
11   LLC, an Oregon limited
12   liability company; and COREY
13   THARP,
14        Defendants.
15
16
17   VIDEOCONFERENCE DEPOSITION OF JOHN KATNIC
18        Taken on behalf of the Defendants
19            November 26, 2013
```

### Page 2

    BE IT REMEMBERED THAT pursuant to the Federal Rules of Civil Procedure, the videoconference deposition of JOHN KATNIC was taken before Pamela Beeson Frazier, a Certified Shorthand Reporter for the State of Oregon, on Tuesday, November 26, 2013, commencing at the hour of 2:05 p.m.; the proceedings being reported in the offices of Synergy Legal Services, 1235 SE Morrison Street, 2nd Floor, Portland, Oregon.

### Page 3

APPEARANCES

Appearing on behalf of the Plaintiff:
MS. KIMBERLY SUGAWA-FUJINAGA
McEWEN GISVOLD
1100 SW Sixth Avenue, Suite 1600
Portland, Oregon 97204
Phone 503-226-7321
Fax 503-243-2686
kims@mcewengisvold.com

Appearing on behalf of the Defendants:
MS. JUDY SYNDER
LAW OFFICES OF JUDY SNYDER
1000 SW Broadway, Suite 2400
Portland, Oregon 97205
Phone 503-228-5027
Fax 503-241-2249
judy@jdsnyder.com

### Page 4

APPEARANCES (Continued)

Appearing on behalf of the witness:
MR. JOSEPH D. ABKIN
(Appearing by videoconference)
FELL, MARKING ABKIN MONTGOMERY GRANET & RANEY
222 E. Carrillo Street, Suite 400
Santa Barbara, California 93101
Phone 805-963-0755
Fax 805-965-7237
jabkin@fmam.com

www.synergy-legal.com                    November 26, 2013

Exhibit 102
Page 2 of 7

John Katnic

2 (Pages 5 to 8)

Page 5

```
 1              EXAMINATION INDEX
 2     EXAMINATION BY:              PAGE NO.
 3     Ms. Snyder              7
 4     Ms. Sugawa-Fujinaga            26
 5     Ms. Snyder             70
 6     Ms. Sugawa-Fujinaga            82
 7
 8
 9
10              EXHIBIT INDEX
11     EXHIBIT NO.    DESCRIPTION       PAGE NO.
12     Ex No. 103    Email chain, the top one    29
13                   dated 7/4/12, to Tharp from
14                   Katnic re: SMC quote.
15     Ex No. 104    Email chain, the top one    34
16                   dated 7/5/12, to Tharp from
17                   Heisler re: 3Rivers and SMC
18                   Warranty Extension Quotes.
19     Ex No. 105    1/30/13 email to Swankosky  45
20                   from Katnic re: Friday
21                   meeting.
22     Ex No. 107    Email chain, the top one    55
23                   dated 3/1/13 to Swankosky
24                   from Katnic re: TSI/Synectics
25                   moving forward.
```

Page 6

```
 1          EXHIBIT INDEX (Continued)
 2     EXHIBIT NO.    DESCRIPTION       PAGE NO.
 3     Ex No. 109   Declaration of John Katnic.   57
 4
 5
 6     NOTE:      Exhibits 106 and 108 are not
 7                marked.
```

Page 7

```
 1            PORTLAND, OREGON, WEDNESDAY, SEPTEMBER 4, 2013
 2                     9:25 A.M.
 3
 4     JOHN KATNIC,
 5     having first been duly sworn, was examined and
 6     testified as follows:
 7
 8                      EXAMINATION
 9     BY MS. SNYDER:
10         Q. Mr. Katnic, first of all, for the
11     record, would you please state your full name?
12         A. John Michael Katnic.
13         Q. And spell your last name?
14         A. K-A-T-N-I-C.
15         Q. You've been subpoenaed today to provide
16     this deposition in a case that's been filed in the
17     US District Court for the District of Oregon known
18     as Technical Security Integration, Inc. versus S&S
19     Electrical Contractors, LLC and Corey Tharp,
20     defendants. I'm Judy Snyder. I represent S&S
21     Electrical Contractors and Corey Tharp.
22             First of all, for the record, would you
23     establish for us where you are currently located.
24         A. We are at 411 East Canon Perdido Street
25     in Santa Barbara, California, 93101. Excuse me, 21,
```

Page 8

```
 1         Q. Thank you. And you are currently
 2     employed by what company, sir?
 3         A. Synectics Systems, Inc.
 4         Q. What is your position with the company?
 5         A. Vice-president of global gaming and
 6     chief operating officer.
 7         Q. Where is your office located?
 8         A. 4180 Via Real, Suite A, Carpinteria,
 9     California, 93013.
10         Q. And are you also a resident in that area
11     of California?
12         A. Yes.
13         Q. What is the nature of the business
14     Synectics is engaged in?
15         A. We manufacture digital recording systems
16     for surveillance applications, primarily in casinos
17     in North America, elsewhere around the world in oil
18     refineries, transportation applications, banking,
19     and so on.
20         Q. And as a result of the work that
21     Synectics performs in the security arena, has
22     Synectics done business in the past with Technical
23     Securities -- excuse me -- Technical Security
24     Integration, Inc., TSI?
25         A. Yes.
```

John Katnic

3 (Pages 9 to 12)

### Page 9

1   Q. For what period of time, to your
2   knowledge, has Synectics been doing business for
3   TSI?
4   A. I'm going to estimate six years, give or
5   take.
6   Q. And as a result of the work that
7   Synectics has done with TSI, did you become
8   acquainted with Corey Tharp?
9   A. Yes.
10  Q. Did you know Mr. Tharp before he went to
11  work at TSI?
12  A. No.
13  Q. So you didn't know him as a result of
14  any of the work he had done in casinos or with other
15  entities?
16  A. No.
17  Q. In February of this year, February of
18  2013, did you attend the World Gaming Protection
19  Conference in Las Vegas, Nevada?
20  A. Yes.
21  Q. Were you there as a Synectics
22  representative?
23  A. Yes.
24  Q. Do you recall the dates that you
25  attended that conference?

### Page 10

1   A. I arrived on the 24th and left on the
2   28th, and the conference hours were on the 26th and
3   27th.
4   Q. While you were in --
5   A. The exhibit hours -- there may have been
6   conferences before that. But the exhibit, which is
7   what I was attending, was the 26th and 27th.
8   Q. While you were at the Las Vegas
9   conference, did you see Craig Swankosky of TSI?
10  A. Yes.
11  Q. On how many occasions did you have
12  contact with Mr. Swankosky while at the gaming
13  conference?
14  A. A handful of times. We were exhibiting
15  opposite one another across a small conference room,
16  so we crossed paths a couple of times throughout the
17  show.
18  Q. And also, did you see Corey Tharp at
19  that show?
20  A. Yes.
21  Q. Now, at that point in time did you know
22  that Mr. Swankosky was the president of TSI?
23  A. Yes.
24  Q. Did you know he was an owner of TSI?
25  A. Yes.

### Page 11

1   Q. Did you learn that Mr. Tharp was no
2   longer working for TSI?
3   A. I learned that prior to the show. But I
4   was aware of that, yes.
5   Q. So you were aware that Mr. Tharp was no
6   longer working for TSI when you saw him down at the
7   World Game Protection Conference in Las Vegas?
8   A. That's correct.
9   Q. Mr. Katnic, while you were at that
10  conference, did Craig Swankosky talk to you about
11  Corey Tharp?
12  A. Yes.
13  Q. Did he initiate that contact about
14  Mr. Tharp, or did you ask him questions about
15  Mr. Tharp?
16  A. He initiated it.
17  Q. What did Mr. Swankosky, Craig Swankosky,
18  tell you about Corey Tharp?
19  A. I don't recall exactly how he led into
20  the conversation, but it moved on to comments about
21  Corey. Specifically: You should stay away from
22  him, he's under investigation by the Oregon Gaming
23  Authority for theft and other serious infractions,
24  and he'll never get a license in that state again.
25  So watch out for him. That was the gist of it.

### Page 12

1   Q. Where did this conversation occur?
2   A. In the aisleway out in front of my
3   booth.
4   Q. During the conference itself?
5   A. During exhibit -- the way it works is
6   there's exhibit floor hours and then there are
7   conferences where the attendees go into, and they
8   break and come out into the exhibit hall. And this
9   happened during one of the breaks.
10  Q. So was it during the time when attendees
11  at the conference were milling around the exhibit
12  hall?
13  A. There were some, but most were in the
14  conference.
15  Q. Mr. Katnic, was anyone else who you know
16  within hearing distance of Mr. Swankosky when he
17  made these statements?
18  A. Not that I recall.
19  Q. So when Craig Swankosky advised you that
20  Mr. Tharp was under investigation by the Oregon
21  Gaming Commission for theft, did he tell you what
22  Mr. Tharp was accused of stealing?
23  A. I don't believe so. I don't recall
24  that.
25  Q. At any time during that conversation did

John Katnic

4 (Pages 13 to 16)

### Page 13

1  Mr. Swankosky tell you that Mr. Tharp had stolen
2  some equipment?
3      A. I had -- I heard, and I don't recall if
4  it was during that conversation or another; but yes,
5  that he had stolen some equipment -- something to
6  the effect of he had stolen something from TSI after
7  leaving or something. I don't recall if it was that
8  day or at a different time, but I recall that being
9  said.
10     Q. As a point of clarification, Mr. Katnic,
11 did you have more than one conversation with Craig
12 Swankosky in which he made a representation that
13 Mr. Tharp was under investigation for theft?
14     A. Yes.
15     Q. And I appreciate what you're telling me
16 is that you're having some difficulty saying
17 specifically whether it was this conversation in the
18 exhibit hall in which Mr. Craig Swankosky
19 specifically identified that it was equipment. Is
20 that correct?
21     A. Correct.
22     Q. Okay. When you were talking with Craig
23 Swankosky in the exhibit hall, this discussion we
24 were just talking about, you made a statement that
25 Mr. Tharp -- you were told Mr. Tharp was under

### Page 14

1  investigation for theft and other serious
2  infractions. By "serious infractions," were you
3  given any information by Craig Swankosky as to what
4  those infractions were?
5      A. No. And I'm not even sure he said the
6  word "infractions." It was just implied that he was
7  being investigated for some serious things. I don't
8  know if the word "infractions" was used. That was
9  my word.
10     Q. I appreciate the clarification. Thank
11 you.
12     Based upon what Craig Swankosky told you
13 in that conversation about Mr. Tharp being under
14 investigation for theft, did you interpret that to
15 mean he was being under investigation for having
16 committed a crime?
17     A. Yes.
18     Q. And when Craig Swankosky told you that
19 Mr. Tharp would never get a license, what type of a
20 license did you believe he was referring to?
21     A. A license to work in gaming facilities.
22     Q. And what did you base that belief on?
23     A. Because that's what we all have in
24 common. We're all selling to casinos, and you have
25 to have a license to work in a casino. And if one

### Page 15

1  is being investigated and will not get a license, I
2  assumed since we were at a gaming show and we all
3  sell gaming, that it was related to a gaming
4  license.
5      Q. Fair enough. You also indicated that
6  Mr. Craig Swankosky made a statement to you about
7  watching yourself in connection with Mr. Tharp. Did
8  I misinterpret that?
9      A. No. Just watch out for him, as in watch
10 out, be careful about doing business with him. It's
11 my belief that he was -- either suspected that Corey
12 and Synectics might do business together or had
13 heard we had talked or whatever.
14     But my -- the feeling I got was, watch
15 out, don't do work with that guy, it could reflect
16 poorly on you. That was the feeling I got from it.
17     Q. Mr. Katnic, when Craig Swankosky spoke
18 with you at the World Gaming Protection Conference
19 in late February, as you just described, had you
20 already had some discussions with Corey Tharp about
21 possibly doing business with Mr. Tharp or the
22 company he was working for?
23     A. Yes.
24     Q. When did those discussions occur?
25     A. We probably had our first discussions

### Page 16

1  sometime in mid-December, maybe -- yeah,
2  mid-December is my best recollection --
3      Q. And --
4      A. -- of 2012.
5      Q. And as of the date of the gaming
6  commission event in Las Vegas, did Mr. Tharp or S&S
7  have a formal business relationship established with
8  Synectics?
9      A. We had discussed making them a reseller.
10 They completed a reseller application. We had a
11 provisional working agreement to provide warranty
12 service, and there was a potential and intention to
13 expand that to a full reseller relationship if and
14 when S&S was able to get licensed.
15     Q. The information that Craig Swankosky
16 gave you during the gaming commission meeting, did
17 that cause you to be concerned about doing business
18 with Mr. Tharp or with S&S, his employer?
19     A. Yes.
20     Q. What did you do with the -- as a result
21 of the information Craig Swankosky gave you at the
22 gaming commission meeting?
23     A. The -- there was a customer, an end-user
24 casino, who had expressed interest in working with
25 Corey back in December. That's Spirit Mountain

John Katnic

5 (Pages 17 to 20)

Page 17

1  Casino. Steve Bobb. Tracey Howerton. Steve Bobb was
2  at that show.
3       And because this information could
4  jeopardize our ability to work with Corey and his
5  new company, I approached Steve Bobb later at the
6  show, asked him if he had heard any rumors about
7  Corey and an investigation.
8       And he said that he -- at that point he
9  had heard the same thing from Craig Swankosky and
10 that he was investigating it for himself.
11      Q. Did Mr. Bobb tell you what he was doing?
12      A. He indicated that because of his
13 relationship with the Oregon Gaming Commission and
14 various police and entities that he was going to
15 check out if, in fact, Corey was under investigation
16 or suspicion or if anything had been filed. So he
17 was going to check his sources and find out for
18 himself.
19      Q. And did Mr. Bobb ever advise you what he
20 had learned?
21      A. Yes. He came back just a few hours
22 later and said that he had spoken with contacts
23 inside the -- I believe he said the Florence police
24 or something. I don't know exactly what entity.
25 But basically he had gone and spoken to

Page 18

1  a regulatory or police entity who absolutely refuted
2  that any claims had been filed or whether Corey was
3  under investigation for anything that -- he was
4  unable to find any such complaint.
5       Q. And while you were at the Las Vegas
6  show, did you approach Corey Tharp to discuss with
7  him these accusations?
8       A. I did. After speaking to Steve Bobb, I
9  had alerted Corey that I had gotten -- heard some
10 things that weren't too flattering or sounded a
11 little scary and that he should check it out. And
12 so I presume he did, and I presume that's how you
13 guys knew I'd had this conversation.
14      Q. Let me back up then a little bit and go
15 over that discussion you had with Corey Tharp. At
16 the show when you told Mr. Tharp that you had heard
17 things which were not too flattering about him, did
18 you tell him that the statements were coming from
19 Craig Swankosky?
20      A. I believe I did.
21      Q. And did you tell him what Mr. Swankosky
22 was saying about Corey, specifically that he was
23 under investigation for theft and those types of
24 statements?
25      A. Yes.

Page 19

1       Q. Did you tell Mr. Tharp that Steve Bobb
2  had also heard the same things from Craig Swankosky?
3       A. I don't recall if I told him that or he
4  told me that. I'm not sure. I don't recall who
5  came first. I -- we all eventually knew that day
6  that all had heard it, but I'm not sure if Corey
7  heard it from Steve first or from me first. I don't
8  recall.
9       Q. And was there ever an occasion when you
10 spoke with Tracey Howerton about whether he had
11 heard similar statements from Craig Swankosky?
12      A. I don't believe I spoke to Tracey.
13 Tracey is junior to Steve, and my relationship is
14 more with Steve, so I communicated at that level. I
15 don't recall having a specific conversation with
16 Tracey about it.
17      Q. Mr. Katnic, then I want to take you back
18 to what you said earlier in your deposition. We
19 were talking about this conversation you had with
20 Craig Swankosky in the exhibit hall when
21 Mr. Swankosky first made the statements about
22 Mr. Tharp allegedly being under investigation for
23 theft and that he'd never get a license.
24      You told me that you had other
25 conversations with Mr. Swankosky about that topic.

Page 20

1  When did those conversations occur?
2       A. I was invited to a meeting in Ventura
3  with TSI management, and I attended with Anthony
4  Tallerico, and I believe the date was February 9th.
5  I don't have my calendar with me, but it was a
6  Friday, a couple of weeks before the show.
7       And we -- they had invited us to come
8  down and see if we could clear the air with some
9  issues we had had on projects we worked on together
10 before the show.
11      And so we came down to this meeting
12 where Craig and his sister Janice and his brother
13 Thomas and their accountant Anthony Tallerico, my
14 employee and myself were all in a room, and we spent
15 a couple of hours talking. And it was during that
16 discussion where similar remarks were made.
17      Q. By whom?
18      A. By Craig.
19      Q. And I appreciate the fact you told me
20 they were similar remarks, but can you be more
21 specific about what Craig Swankosky said during that
22 meeting in Ventura, California?
23      A. In effect, that Corey has gotten himself
24 into some serious trouble and is -- basically he's
25 got -- he's in some big trouble. And unlikely -- I

John Katnic

6 (Pages 21 to 24)

Page 21

1   don't know if -- scratch unlikely.
2         He basically said he's got himself in
3   some big trouble, and you're not going to want to be
4   working with him, in effect. Again, stay away from
5   him, that he's in some trouble. That was the first
6   I'd --
7         Q. That was the first time you heard this
8   accusation about Corey from anyone?
9         A. Yes.
10        Q. So in the meeting in Ventura when Craig
11  Swankosky made this statement about Corey getting
12  himself into trouble, did he tell you what the
13  nature of the trouble was?
14        A. That's the part where I -- my memory
15  isn't perfect. It was either in that meeting or the
16  one in Vegas where he said that he had stolen some
17  things on his way out of the company.
18        And I don't recall which encounter it
19  was where that particular fact came up. But
20  basically that he had done some things wrong, and he
21  was being investigated, and he was -- and for us to
22  be careful about doing business with him, in effect.
23        Q. I just want to then kind of drill down
24  into a few details. I think you told me a few
25  moments ago that you recall there being an

Page 22

1   allegation by Craig Swankosky that Mr. Tharp had
2   engaged in a theft of equipment?
3         A. Yes.
4         Q. And did he say specifically that it was
5   theft of equipment from a TSI facility?
6         A. He did not say from a TSI facility, but
7   he indicated it was TSI property.
8         Q. And did he describe in any detail the
9   nature of the property which Mr. Tharp allegedly
10  stole?
11        A. I don't -- I don't believe so.
12        Q. At the meeting in Ventura when Craig
13  Swankosky made this statement or these statements,
14  did his sister Janice say anything about these
15  accusations?
16        A. I can't say for sure. There definitely
17  wasn't a refuting or -- I don't remember -- I mean,
18  Craig was doing most of the talking. She had
19  made -- never mind.
20        Q. Had Janice Eaton said anything about
21  Corey Tharp during that Ventura meeting?
22        A. She may have. I honestly don't recall.
23  I remember it clearly coming from Craig, but I don't
24  remember whether Janice added in or did not. I
25  don't recall.

Page 23

1         Q. What about Thomas Swankosky? Did he add
2   anything to the discussion about Corey Tharp when
3   you were in Ventura?
4         A. I don't believe so.
5         Q. Based upon what Craig Swankosky told you
6   at the meeting in Ventura, did you conduct any type
7   of an investigation to find out whether there was
8   any truth to those accusations?
9         A. Not at that time.
10        Q. As of February of 2013 when this
11  conversation occurred in Ventura, were you aware
12  that Mr. Tharp had gone to work for S&S Electrical?
13        A. Yes.
14        Q. And were you aware that S&S Electrical
15  was seeking approval from Synectics to provide
16  warranty service for Synectics' equipment?
17        A. Yes.
18        Q. And am I correct in my understanding
19  that without Synectics's approval, it's not possible
20  for a company like S&S to service Synectics'
21  equipment?
22        A. That's correct, without voiding
23  warranty.
24        Q. And does S&S now have an agreement with
25  Synectics to be Synectics' reseller?

Page 24

1         A. Yes.
2         Q. And can S&S provide warranty service for
3   Synectics' products?
4         A. Yes.
5         Q. Is Synectics still doing business with
6   TSI?
7         A. We have officially terminated their
8   reseller agreement approximately 30 days ago. We
9   have some outstanding business to yet be resolved,
10  but we're not seeking any new business opportunities
11  together.
12        Q. Mr. Katnic, were there any other
13  occasions other than the February 9th meeting in
14  Ventura and the late February 2003 meeting during
15  the gaming conference -- any other occasions that
16  Craig Swankosky spoke with you about Corey Tharp?
17        A. No, not that I can recall.
18        Q. How about any of the other management
19  level employees at TSI, have any of them at any
20  point in time made any statements to you about Corey
21  Tharp?
22        A. Again, not -- not that come to mind.
23        Q. I suspect you recall talking to Holly
24  Lloyd, an attorney within my firm, approximately
25  three weeks ago. Is that correct?

Judy Danelle Snyder, OSB No. 732834
E-mail: judy@jdsnyder.com
Holly Lloyd, OSB No. 942979
E-mail: holly@jdsnyder.com
LAW OFFICES OF JUDY SNYDER
1000 S.W. Broadway, Suite 2400
Portland, OR 97205
Telephone: (503) 228-5027
Facsimile: (503) 241-2249

    Of Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TECHNICAL SECURITY INTEGRATION, INC., a Washington corporation,<br><br>    Plaintiff,<br><br>v.<br><br>S & S ELECTRICAL CONTRACTORS, LLC, an Oregon limited liability company; and COREY THARP,<br><br>    Defendants. | Case No. 3:13-cv-00636-MO<br><br>SATISFACTION OF JUDGMENT |

    WHEREAS, a judgment was entered in the above action on the 20th day of May, 2014, in favor of defendant Corey Tharp and against plaintiff Technical Security Integration, Inc. ("TSI") in the amount of $50,000.00 plus interest from the 20th day of June, 2014, with costs to be taxed for defendant S & S Electrical Contractors, LLC against TSI, and costs in the amount of $7,271.22, having been taxed on the 15th day of July, 2014, and said judgment with interest and costs thereon having been fully paid, and it is certified that there are no outstanding executions with any Sheriff or Marshall,

    THEREFORE, full and complete satisfaction of said judgment is hereby acknowledged, and the Clerk of the Court is hereby authorized and directed to make an entry of the full and complete

PAGE 1 -SATISFACTION OF JUDGMENT

LAW OFFICES OF JUDY SNYDER
1000 S.W. BROADWAY, SUITE 2400
PORTLAND, OREGON 97205
(503) 228-5027
FAX (503) 241-2249

Exhibit 103
Page 1 of 2

satisfaction on the docket of said judgment.

DATED this 6th day of October, 2014.

        LAW OFFICES OF JUDY SNYDER

        /s/ Holly Lloyd
        HOLLY LLOYD, OSB No. 942979
        Telephone: (503) 228–5027
        Facsimile: (503) 241-2249
        Email: holly@jdsnyder.com
        Of Attorneys for Defendants

PAGE 2 -SATISFACTION OF JUDGMENT

LAW OFFICES OF JUDY SNYDER
1000 S.W. BROADWAY, SUITE 2400
PORTLAND, OREGON 97205
(503) 228-5027
Fax (503) 241-2249

Exhibit 103
Page 2 of 2